UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIDGE METAL INDUSTRIES, L.L.C., JOSEPH
MESSA and BLAISE FREDELLA,

                         Plaintiffs,                    Case No. 10-CV-5235 (KMK)

       -v-                                              OPINION AND ORDER

THE TRAVELERS INDEMNITY COMPANY,

                         Defendant.

Appearances:

Sean Mack, Esq.
Dennis T. Smith, Esq.
Pashman Stein, P.C.
Hackensack, New Jersey
*Counsel for Plaintiffs*

Joanna M. Roberto, Esq.
Goldberg Segalla, LLP
Mineola, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

       Plaintiffs Bridge Metal Industries, L.L.C. ("Bridge Metal"), Joseph Messa ("Messa"),

and Blaise Fredella ("Fredella") (collectively, "Plaintiffs")[1] bring this action against The

Travelers Indemnity Company ("Defendant"), seeking a declaratory judgment that Defendant is

required to reimburse Plaintiffs for the costs and expenses they incurred in defending two

lawsuits, *National Lighting Company, Inc. v. Bridge Metal Industries, L.L.C.*, No. 08-CV-3150

(S.D.N.Y. 2008) (the "NY Action") and *National Lighting Company, Inc. v. Bridge Metal*

_____

       [1] Messa and Fredella are members of Bridge Metal.  (Compl. for Declaratory J. ¶¶ 2-3.)

*Industries, L.L.C.*, No. ESX-C-000173-09 (N.J. Super. Ct. Ch. Div. 2009) (the "NJ Action").

Plaintiffs claim that Defendant was obligated to defend them in these lawsuits under the

Commercial General Liability insurance policy Defendant issued to Bridge Metal (the "Policy"),

while Defendant maintains that no such defense was required under the terms of the Policy.

Defendant has moved to dismiss or, in the alternative, for summary judgment.  Plaintiffs, in turn,

have cross-moved for summary judgment.  For the reasons stated herein, Plaintiffs' motion is

granted and Defendant's motion is denied.

## I.  Background

### A.  Factual Background

#### 1.  The Lawsuits Between Bridge and National Lighting Company, Inc.

Plaintiffs assert that Defendant was required to defend them in two underlying lawsuits in

which they were sued by National Lighting Company, Inc. ("National"), a New Jersey

corporation.  It is necessary to examine the allegations in these underlying lawsuits to determine

whether Defendant had a duty to defend Plaintiffs.  The Court makes no finding regarding the

truth of National's allegations.

#### a.  The NY Action

National filed a complaint against Bridge Metal, Messa, Fredella, and a number of other

companies and individuals on March 28, 2008, in the United States District Court for the

Southern District of New York.  (Certification of Dennis T. Smith ("Smith Cert.") Ex. A.)[2]

---

[2] National filed an amended complaint on May 22, 2008.  (Smith Cert. Ex. B., at 1.)
However, both Parties have provided the Court only with National's initial complaint (*id.* Ex. A;
Decl. of Joanna M. Roberto Ex. B), and Plaintiffs sent the initial complaint to Defendant when
Plaintiffs requested coverage under the Policy, (Smith Cert. Ex. F).  Accordingly, the Court's
evaluation of Defendant's duty to defend is based on the facts and allegations as contained in
National's initial complaint.

National manufactures and designs fluorescent lighting fixtures for installation in commercial offices, educational facilities, and government buildings.  (*Id.* ¶ 18.)  According to National, its fixtures are "inherently distinctive" from those of its competitors and "carry a trade dress recognized by its customers, end users and others in the lighting industry as exceptionally aesthetic, superior in quality, and easy to assemble."  (*Id.* ¶¶ 25-26.)  In fact, National claimed that it "has developed a trade dress with a total image so distinct that a quick examination . . . will cause its customers, potential customers and those involved in the selection and purchasing of lighting fixtures for commercial use to instantly recognize the origin of its product as National's."  (*Id.* ¶ 27.)

Bridge Metal began to manufacture and assemble lighting fixtures exclusively for National in July 2005 and, pursuant to a confidentiality agreement, National provided Bridge Metal with confidential information to enable Bridge Metal to manufacture National's products.  (*Id.* ¶¶ 20, 33.)  National also considered a potential merger with Bridge Metal but decided against it; according to National, Bridge Metal was then obligated to destroy or return the confidential information.  (*Id.* ¶¶ 36-37.)  However, National alleged that in late 2007, it learned that instead Bridge Metal:  was using the information to "manufacture, market, and sell products apparently identical to National's" (*id.* ¶ 38); "had created National-like fixtures, virtual clones of the National product line, which were being marketed to the public in [Bridge Metal's] showroom" (*id.* ¶ 39); was "telling the potential clientele . . . [that Bridge Metal] could manufacture fixtures just like National's for a less expensive price" (*id.* ¶ 40); and was "marketing to National's very same clientele these unlawfully manufactured lighting fixtures," (*id.* ¶ 48).  National further alleged that Bridge Metal helped create other entities, including one called Picasso, "to handle the marketing of the lighting fixtures cloned from the National Product

line." (*Id.* ¶ 41.)  According to National, Bridge Metal's lighting fixtures "are so similar in appearance to National's and infringe on National's distinct trade dress such that there is a substantial likelihood the general consuming public will be confused as to the identity and origin of [Bridge Metal's] fixtures." (*Id.* ¶ 49.)  In this vein, National claimed that Bridge Metal was trying to "falsely advertise and deceptively palm off their products so as to confuse and deceive the public about the true origin of the fixtures." (*Id.* ¶ 52.)  National alleged that Bridge Metal's conduct was "intentional, willful, wanton, malicious, oppressive, and reckless." (*Id.* ¶ 53.)

National sued Bridge Metal, Messa, Fredella, and others, under Section 43(a) of the Lanham Act and New York state law, for trade dress infringement, trade dress dilution, reverse palming-off, false advertising and labeling, false designation of origin, unfair competition, breach of contract, breach of implied covenant of good faith and fair dealing, deceptive trade practices, unjust enrichment and imposition of constructive trust, and tortious interference with prospective economic relations. (*Id.* ¶¶ 55-92.)  For each of its seventeen causes of action, National reasserted each of the factual allegations set forth in its complaint.  In its demand for relief, National asked the court for a variety of remedies, including damages and to enjoin Bridge Metal from, inter alia, "[m]anufacturing, creating, designing, marketing, selling, advertising, producing, making, or otherwise using in any manner any lighting fixture not originating with National, that is likely to cause confusion, deception, or mistake or that dilutes or is likely to dilute the distinctive quality thereof; [or] . . . [e]ngaging in any other conduct that tends to falsely represent, or is likely to confuse, mislead, or deceive purchasers, [Bridge Metal's] customers, National's customers, and other members of the public to believe that [Bridge Metal's] products are connected with National . . . ." (*Id.* pp. 27-28.)

4

On March 4, 2009, the Honorable Naomi Buchwald dismissed National's federal claims with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  (Smith Cert. Ex. B, at 2.)  Judge Buchwald dismissed National's state law claims, without prejudice, to allow National to consider whether it wanted to continue to pursue these claims in a New York court, in light of a New York state law prohibiting a foreign corporation from maintaining an action in New York if it is doing business in New York without authority.  (*Id.* at 20-22 (citing N.Y. Bus. Corp. Law § 1312).)  National voluntarily dismissed its state law claims on March 31, 2009.

### b.  The NJ Action

After the NY Action was dismissed, National filed a complaint on June 25, 2009, against Bridge Metal, Messa, Fredella, and others, in New Jersey Superior Court, Chancery Division. (Smith Cert. Ex. C.)  The complaint contained many of the same factual allegations as the complaint filed in the NY Action.  National alleged that in the course of negotiations and pursuant to the written confidentiality agreement, National provided Bridge Metal with "highly-valuable intellectual property" including assembly drawings, wiring instructions, mounting details, actual fixture samples, specification sheets, computer generated images, hands-on training seminars, emails, and sourcing information.  (*Id.* ¶ 21.)  National claims that after negotiations regarding the potential merger ended, Bridge Metal was "immediately obligated under . . . the Agreement to either destroy all originals and copies of Confidential Information or return it all to National."  (*Id.* ¶ 24.)  According to National, it later discovered that Bridge Metal and others "had purloined and stolen for their own use and benefit National's technical know-how, drawings and other intellectual property specifically covered by the Agreement in order to manufacture, engineer, promote, market, advertise and sell fixtures that had been cloned from

National's product line under the Picasso name" (*id.* ¶ 31), and that "[v]irtual clones of the National product line were being marketed to the public in [Bridge Metal's] showroom," (*id.* ¶ 32).

In its complaint in the NJ Action, National asserted claims against Bridge Metal, Messa, Fredella, and others, under New Jersey state law, for breach of contract, breach of implied covenant of good faith and fair dealing, conversion, misappropriation, tortious interference with contract, tortious interference with business relations or economic advantage, unfair competition, common law fraud, civil conspiracy, and constructive trust.  (*Id.* ¶¶ 39-99.)  With respect to the conversion cause of action, National alleged that Bridge Metal and the other defendants "converted National's property by misappropriating it for their own use and failing to return it after termination of their relationship with National" and that the conversion was "willful and wanton." (*Id.* ¶¶ 49-50.)  For each cause of action, National reasserted each factual allegation set forth in its complaint.  In connection with each cause of action, National requested, inter alia, that the court award damages and enjoin Bridge Metal from "[m]anufacturing, creating, designing, marketing, selling, advertising, producing, making, or otherwise using in any manner any lighting fixture not originating with National, that is likely to cause confusion, deception, or mistake or that dilutes or is likely to dilute the distinctive quality thereof."  (*Id.* ¶¶ 39-99.)

On June 30, 2010, the court dismissed the NJ Action against Bridge Metal, Fredella, and Messa for lack of personal jurisdiction.  (Smith Cert. Ex. D.)

## 2.  The Policy

The Policy is identified as No. I-680-5390W931-IND-07 and covered the period from October 19, 2007 through October 19, 2008.  (Pls.' Rule 56.1 Statement of Material Facts ¶ 1.) The provisions at issue involve coverage for advertising injury and property damage.

6

a.  Advertising Injury

The applicable language regarding advertising injury is as follows:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'advertising injury' . . . to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages even if the allegations of the 'suit' are groundless, false, or fraudulent.  However, we will have no duty to defend the insured against any 'suit' seeking damages for . . . 'advertising injury' . . . to which this insurance does not apply.

(Decl. of Joanna M. Roberto ("Roberto Decl.") Ex. A, at T0183.)  "This insurance applies to . . . '[a]dvertising injury' caused by an offense committed in the course of advertising your goods, products or services . . . ."  (*Id.*)  Advertising injury is defined, in relevant part, as "injury, arising out of . . . [i]nfringement of copyright, title or slogan, provided that claim is made or 'suit' is brought by a person or organization claiming ownership of such copyright, title or slogan."  (*Id.* at T0186.)  The terms copyright, title, and slogan are not defined in the policy.  There are also certain specific exclusions to which this insurance does not apply, including an "'advertising injury' . . . caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict . . . 'advertising injury,'" as well as an "'[a]dvertising injury . . . arising out of a breach of contract.  (*Id.* at T0183-84.)[3]

---

[3] The Policy includes several "endorsements" modifying the coverage provided by the base Commercial General Liability Coverage.  The applicable advertising injury coverage provision is contained in one of these endorsements, entitled "Web Xtend Liability – New York," and the provision in this endorsement deletes entirely and replaces the advertising injury provision in the base policy.  (Roberto Decl. Ex. A, at T0183.)  The original provision, which was replaced by the language cited above, defined advertising injury as an injury arising out of, inter alia, "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'"  (*Id.* at T0143.)  This previous iteration also defined "[a]dvertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."  (*Id.* at T0141.)  The version of advertising injury coverage currently in effect does not define advertisement.  The prior provision also specifically excluded from coverage advertising injury "arising out of the

### b.  Property Damage

The applicable language regarding property damage is as follows:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages even if the allegations of the 'suit' are groundless, false or fraudulent.  However, we will have no duty to defend the insured against any 'suit' seeking damages for . . . 'property damage' to which this insurance does not apply.

(Roberto Decl. Ex. A, at T0174.)  "This insurance applies to . . . 'property damage' only if:  (1) [t]he . . . 'property damage' is caused by an 'occurrence' . . . ."  (*Id.* at T0130.)  Property damage is defined, in relevant part, as:  "Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."  (*Id.* at T0164.)  Occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.* at T0143.)  There are also certain specific exclusions to which this insurance does not apply, including:  "'property damage' expected or intended from the standpoint of the insured" (*id.* at T0131), and "'[p]roperty damage' to . . . [p]ersonal property in the care, custody or control of the insured," (*id.* at T0133).

### 3. Defendant's Denial of Plaintiffs' Requests for Coverage

On April 28, 2008, Defendant sent Fredella a letter informing Bridge Metal that Defendant had determined that it had no obligation to defend or indemnify Bridge Metal for the NY Action because none of the allegations in National's complaint constituted an advertising

---

infringement of copyright, patent, trademark, trade secret or other intellectual property rights[;] [h]owever, this exclusion does not apply to infringement, in your 'advertisement,' of copyright, trade dress or slogan."  (*Id.* at T0135.)  The Web Xtend Liability endorsement does not contain a similar exclusion for intellectual property infringement.

injury under the Policy, and, even if they did, certain exclusions would apply to bar coverage. (Smith Cert. Ex. F.)

On August 21, 2009, Defendant sent Fredella a letter informing Bridge Metal that Defendant had determined that it had no obligation to defend or indemnify Bridge Metal for the NJ Action because National's complaint did not allege either property damage or advertising injury as defined in the Policy and that coverage would also be denied under specified exclusions.  (*Id.* Ex. G.)

### B.  Procedural Background

On June 2, 2010, Plaintiffs filed their Complaint for Declaratory Judgment in Supreme Court of New York, County of Westchester.  On July 9, 2010, Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1441, 1332, and 1446.  (Dkt. No. 1.)[4]  On December 17, 2010, Plaintiffs moved for summary judgment (Dkt. No. 11), and Defendant moved to dismiss the case or, in the alternative, for summary judgment, (Dkt. No. 12).  The Court held oral argument on June 7, 2011.  (Dkt. No. 20.)

## II.  Discussion

### A.  Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (same).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

---

[4] Plaintiffs are citizens of New York.  (Notice of Removal ¶¶ 6-7.)  Defendant is a citizen of Connecticut.  (*Id.* ¶ 8.)  Accordingly, the action was properly removed.

against the movant." *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of

material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.

2005).

Here, the Parties do not assert that there are issues of material fact. Instead, they dispute

the legal meaning of the Policy's coverage.

### B.  Duty to Defend

Plaintiffs initially sought a declaration that Defendant is required to:  (1) reimburse them

for fees and costs spent in defending the NY Action and NJ Action; (2) assume the defense of

Plaintiffs in the NJ Action; and (3) indemnify Plaintiffs for any liability that they might incur

from the NJ Action.[5]  However, because the NJ Action now also has been dismissed, the only

remaining issue is whether Defendant had a duty to defend Plaintiffs and is thus required to

reimburse Plaintiffs for the costs and expenses incurred in defending the two underlying actions.[6]

The Parties agree that New York law governs this dispute.  "[U]nder New York law, 'the

insurer's duty to furnish a defense is broader than its obligation to indemnify.'"  *Hugo Boss*

*Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d Cir. 2001) (quoting *Seaboard Sur. Co. v.*

*Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984)); *see also Century 21, Inc. v. Diamond State Ins.*

*Co.*, 442 F.3d 79, 82 (2d Cir. 2006) ("The 'exceedingly broad' contours of an insurer's duty to

---

[5] At the time that Plaintiffs filed their Complaint in the instant case, the NY Action had
already been dismissed; thus, no ongoing defense or potential indemnification was required in
that action.

[6] Plaintiffs also requested compensatory damages for breach of contract in their
Complaint.  However, Plaintiffs make no mention of that relief in their motion papers; thus, the
Court will assume that Plaintiffs are no longer seeking compensatory damages.

defend have been articulated clearly and repeatedly by the New York Court of Appeals."); *Atl. Mut. Ins. Co. v. Terk Techs. Corp.*, 763 N.Y.S.2d 56, 61 (App. Div. 2003) ("The duty of an insurer to provide a defense for its insured is distinct from, and far broader than, its duty to indemnify.").  If any allegations "fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be," an insurer must defend. *Seaboard*, 476 N.E.2d at 275.  "While the insurer's burden is a heavy one, the court should not impose a duty to defend on an insurer through a strained, implausible reading of the complaint that is linguistically conceivable but tortured and unreasonable."  *Atl. Mut.*, 763 N.Y.S.2d at 62 (internal quotation marks omitted).  However, "a defense obligation may be avoided only where there is 'no possible factual or legal basis' on which an insurer's duty to indemnify under any provision of the policy could be held to attach."  *Century 21*, 442 F.3d at 82-83 (quoting *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 477 N.E.2d 441 (N.Y. 1985)).

To determine if a defense obligation exists, courts "compare the allegations of the complaint to the terms of the policy."  *A. Meyers & Sons Corp. v. Zurich Am. Ins. Grp.*, 545 N.E.2d 1206, 1208 (N.Y. 1989); *see also Accessories Biz, Inc. v. Linda & Jay Keane, Inc.*, 533 F. Supp. 2d 381, 386 (S.D.N.Y. 2008) (same).  "If the facts alleged raise a reasonable possibility that the insured may be held liable for some act or omission, then the insurer must defend."  *A. Meyers*, 545 N.E.2d at 1208; *see also Atl. Mut.*, 763 N.Y.S.2d at 61 ("An insurer's duty to defend is triggered whenever allegations set forth in a complaint state a cause of action that gives rise to a reasonable possibility of recovery under the policy.").  "Conversely, if the allegations interposed in the underlying complaint allow for no interpretation which brings them within the policy provisions, then no duty to defend exists."  *Atl. Mut.*, 763 N.Y.S.2d at 61-62.  "The insurer's duty to defend the entire action is triggered even if only one claim is potentially

11

covered by the insurance policy."  *Mass. Bay Ins. Co. v. Penny Preville, Inc.*, No. 95-CV-4845,

1996 WL 389266, at *4 (S.D.N.Y. July 10, 1996) (citing *Seaboard*, 476 N.E.2d at 275); *see also*

*GRE Ins. Grp. v. GMA Accessories, Inc.*, 691 N.Y.S.2d 244, 247 (Sup. Ct. 1998) ("[A]n insurer

must defend against an entire action even if only one claim potentially falls within the indemnity

coverage of the policy.").

Thus, the Court must determine whether National's allegations against Bridge Metal,

"liberally construed," are "within the embrace of the [P]olicy."  *Century 21*, 442 F.3d at 83

(citing *Colon v. Aetna Life & Cas. Ins. Co.*, 484 N.E.2d 1040 (N.Y. 1985)).  "In interpreting the

insurance policy, the ordinary rules of contractual interpretation apply."  *Mass. Bay*, 1996 WL

389266, at *5.  "If the language of the policy is clear on its face, that language governs, but any

terms that are ambiguous must be construed in favor of the insured."  *Id.* (alteration and internal

quotation marks omitted).  "If a relevant term is not defined in the policy, it is to be afforded its

ordinary meaning, which may include its usage in federal law; [and, again,] any ambiguity must

be resolved in favor of the insured."  *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 751 F. Supp.

2d 444, 450 (E.D.N.Y. 2010).

"'[T]he question of whether an insurance policy is ambiguous is a matter of law to be

determined by the court.'"  *Hugo Boss*, 252 F.3d at 616 (quoting *Bd. of Managers of Yardarm

Condo. II v. Fed. Ins. Co.*, 669 N.Y.S.2d 332, 332 (App. Div. 1998)).  The Second Circuit has

explained that "an ambiguous word or phrase is one capable of more than one meaning when

viewed objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business[;] [c]onversely, . . . contract language is

not ambiguous if it has a definite and precise meaning, unattended by danger of misconception

in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 617 (alterations, citation, and internal quotation marks omitted).

### C.  Coverage for Advertising Injury

To trigger Defendant's duty to defend under the Policy, National must have alleged an injury that:  (1) constitutes one of the offenses enumerated in the Policy's definition of "advertising injury" and (2) was caused by an offense committed by Bridge Metal "in the course of advertising [its] goods, products or services."  *See A. Meyers*, 545 N.E.2d at 1208.  Defendant argues that it had no duty to defend Bridge Metal because:  (1) National's underlying complaints did not allege an enumerated advertising injury; (2) any injury, if one did occur, was not in the course of advertising; and (3) in any event, Policy exclusions barred coverage.

#### 1.  Enumerated Offense

The Policy defines advertising injury, in relevant part, as "injury, arising out of . . . [i]nfringement of copyright, title or slogan."  (Roberto Decl. Ex. A, at T0186.)  Plaintiffs argue that National's trade dress infringement and unfair competition claims allege title infringement. (Mem. of Law in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem.") 16-17; Br. in Opp'n to Travelers Indemnity Company's Mot. to Dismiss ("Pls.' Opp'n") 7-9.)  The Policy defines neither "infringement" nor "title."  Defendant argues that the Web Xtend Liability Endorsement specifically deleted any coverage for trade dress infringement by replacing "trade dress" in the Policy's definition of advertising injury with "title."  (Def. Travelers Indemnity Company's Mem. of Law in Supp. of its Mot. to Dismiss Pursuant to Rule 12(b)(6) ("Def.'s Mem.") 13.) Defendant maintains that reading "trade dress" and "title" as synonymous would render the modification of the Policy meaningless and that interpreting National's allegations as encompassing infringement of title would be nonsensical.  (*Id.* at 16-17.)  Plaintiffs agree that

trade dress and title are not synonomous; however, it is Plaintiffs' position that the Web Xtend

Liability Endorsement actually expanded coverage because title is broader than trade dress.

(Pls.' Opp'n 2-4.)

The meaning of title in this context is not clearly established by either New York or

federal case law.  Accordingly, Plaintiffs urge the Court to look to the dictionary definition of

title for guidance.  Indeed, this was the approach taken recently by another district court within

the Second Circuit when presented with a similar issue.  *See CGS Indus.*, 751 F. Supp. 2d at 450

("Since 'title' is not defined in the Web Xtend Policy, and no New York court has authoritatively

determined its scope, in addition to its use in federal law, use of a dictionary is instructive.").

Here, Plaintiffs have cited a definition of title, as did the *CGS Industries* court, from the sixth

edition of Black's Law Dictionary:  "A mark, style or designation; a distinctive appellation; the

name by which anything is known."  *Id.* (citing Black's Law Dictionary 1485 (6th ed. 1990)).

If this was the applicable definition of infringement of title, the Court would agree with

Plaintiffs that National's complaints allege conduct that fits within this definition.  For example,

National alleged that it "has developed a trade dress with a total image so distinct that a quick

examination . . . will cause its customers, potential customers and those involved in the selection

and purchasing of lighting fixtures for commercial use to instantly recognize the origin of its

product as National's."  (Smith Cert. Ex. A, ¶ 27.)[7]  It is this distinctive, overall image that

Bridge Metal was alleged to have copied.  The appearance of the light fixtures can be viewed as

the style or designation by which National's product is known; indeed, that seems to be the very

---

[7] Trade dress "includes the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers."  *Milstein v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995).

14

heart of National's case against Bridge Metal.  Thus, by alleging that Bridge Metal copied this trade dress, National could be claiming that Plaintiffs infringed National's title under the Black's sixth edition definition.[8]

However, that particular definition of title was no longer included in the eighth edition of Black's Law Dictionary, published in 2004 (and therefore in effect during the time period covered by the Policy), or in the current ninth edition, published in 2009.  The definition of title in the eighth edition, which is the same as in the current edition, is:  (1) "The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person who owns property and the property itself"; (2) "Legal evidence of a person's ownership rights in property; an instrument (such as a deed) that constitutes such evidence"; (3) "The heading of a statute or other legal document"; (4) "A subdivision of a statute or code"; (5) "The name by which a court case or other legal proceeding is distinguished from others"; (6) "An appellation of office, dignity, or distinction."  Black's

---

[8] This conclusion applies to the NJ Action, even though it does not explicitly mention trade dress infringement, because it does contain the same factual allegations that Plaintiffs copied the appearance and image of National's product.  (Smith Cert. Ex. C, ¶¶ 31-32, 34.)  *See Sidney Frank Imp. Co. v. Farmington Cas. Co.*, No. 97-CV-9324, 1999 WL 173263, at *3 (S.D.N.Y. Mar. 26, 1999) (noting that a court "is not required to accept the legal characterization of the causes of action alleged in the complaint" in evaluating the duty to defend) (internal quotation marks omitted); *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 834 N.Y.S.2d 736, 739-40 (App. Div. 2007) (noting that "a party's characterization of the causes of action alleged in a complaint are not controlling as [the court seeks] to determine the nature of the claims based upon the facts alleged and not the conclusions which the pleader draws therefrom" (alteration and internal quotation marks omitted)); *Monarch Ins. Co. of Ohio v. Hetherly*, 560 N.Y.S.2d 745, 748 (Sup. Ct. 1990) ("[The] general rule [is] that, in determining whether an insurance policy provides coverage, the court must look past the labels placed on the causes of action to the facts alleged in the underlying complaint.").  National presumably did not assert a trade dress infringement claim in the NJ Action because Judge Buchwald had dismissed that cause of action in the NY Action for failure to state a claim; however, as noted above, the factual allegations in both actions are substantially similar.

Law Dictionary 1522-24 (8th ed. 2004).   None of these definitions, fairly read, encompasses trade dress infringement or National's allegations.

Nevertheless, the removal of that particular definition of title does not relieve Defendant of its duty to defend.  The Second Circuit has held that if there is legal uncertainty regarding whether cases governing an insurance policy will be read to impose coverage in a given situation, the insurer has a duty to defend.  *See Hugo Boss*, 252 F.3d at 620.  In *Hugo Boss*, the court determined that although there was no duty to *indemnify* because the term "BOSS" was unambiguously not a "trademarked slogan" within the policy's advertising injury coverage, there was still a duty to *defend* based on the existence of applicable case law that rendered uncertain whether the term "trademarked slogan" would be deemed unambiguous.  *Id.* at 619-20, 620 n.11, 622-23.  Here, there is also case law that raises the possibility that claims of trade dress infringement, such as those asserted by National, fall within "infringement of title."  *See CGS Indus.*, 751 F. Supp. 2d at 450-51 (concluding that the complaint's allegations that the insured's misuse of inherently distinctive marks that served to identify the underlying plaintiff as the source of the product and were highly recognized by the public, could constitute infringement of title and therefore the duty to defend was triggered); *Energex Sys. Corp. v. Fireman's Fund Ins. Co.*, No. 96-CV-5993, 1997 WL 358007, at *4 (S.D.N.Y. June 25, 1997) (allegation that the use of the plaintiff's trademark on infringing goods sold by the insured would lead to customer confusion constituted an allegation of infringement of title); *J.A. Brundage Plumbing & Roto-Rooter, Inc. v. Mass. Bay Ins. Co.*, 818 F. Supp. 553, 559 (W.D.N.Y. 1993) (concluding that infringement of title includes trademark or tradename infringement based on Black's definition of title as "a mark, style or designation; a distinctive appellation; the name by which anything is

known"), *vacated due to settlement*.[9]  Defendant attempts to argue that the *CGS Industries*

decision is inapplicable here because it involved a claim for trademark, rather than trade dress,

infringement.  (Def. The Travelers Indemnity Company's Mem. of Law in Opp'n to Pls.' Mot.

for Summ. J. ("Def.'s Opp'n") 11-12.)  However, the reasoning of the *CGS Industries*, *Energex*,

and *J.A. Brundage* courts in addressing trademark claims applies equally to a trade dress

infringement claim such as the one alleged by National.  Those courts determined that title

covers the designation by which something is known.  Here, National clearly asserted that

Bridge Metal injured it by copying the distinct trade dress by which National claims its products

are widely known.[10]  Accordingly, the Court concludes that there was uncertainty as to whether

---

[9] Plaintiffs also cited some non-New York cases in support of their argument that title infringement encompasses trade dress infringement.  (Pls.' Mem. 17-19 (citing *Sentex Sys., Inc. v. Hartford Accident & Indem. Co.*, 882 F. Supp. 930 (C.D. Cal. 1995) and *Merchants Co. v. Am. Motorists Ins. Co.*, 794 F. Supp. 611 (S.D. Miss. 1992)).)  However, those cases also applied the previous Black's definition of title.  Moreover, at least one court within this district has rejected an attempt to use cases applying non-New York law to create legal uncertainty regarding coverage in a New York case.  *See Fantasia Accessories, Ltd. v. N. Assurance Co. of Am.*, No. 01-CV-663, 2001 WL 1478807, at *8 (S.D.N.Y. Nov. 20, 2001) (explaining that the *Hugo Boss* court found a duty to defend based on legal uncertainty because a precedent from a New York district court, applying New York law, had indicated that coverage should be supplied but cases applying other states' laws cannot provide the same uncertainty).

[10] As a practice guide on liability insurance law explains:

Trade dress and trademarks are offered similar protections because the rights themselves are similar.  Both concern a customer's identification of a product with a particular manufacturer or source, but trade dress refers to the overall image, look, or impression of a product that informs the customer.  In other words, trade dress can be thought of as a trademark that focuses on the presentation of the product, including the product's design, packaging, and marketing.

3 New Appleman Law of Liability Insurance § 18.02(1)(c) (Matthew Bender, Rev. Ed. 2011).

National's claims of trade dress infringement could be considered an infringement of title and, accordingly, Defendant had a duty to defend Plaintiffs on these claims.[11]

### 2. In the Course of Advertising

Because the Court has determined that at least one of National's claims could potentially fall within an enumerated advertising injury offense, it must next examine whether the claimed advertising injury at issue allegedly was caused by an offense committed by Plaintiffs in the course of advertising Plaintiffs' goods, products, or services. Plaintiffs argue that this requirement is established because National alleged that it was injured by Bridge Metal's

---

[11] The Court also notes that Defendant sent a letter to the Court, dated May 26, 2011, attaching a recently decided case, *Priceless Clothing Co. v. Travelers Casualty Insurance Co. of America*, No. 11-CV-55, 2011 WL 1900121 (N.D. Ill. May 19, 2011), which it believes is instructive. In that case, the court, applying Illinois law, determined that infringement of title did not include a trade dress infringement claim, based on language from a Seventh Circuit decision stating that "'[t]itle' refers to 'names and related trademarks,' so that a policy provision providing coverage for infringement of title encompasses claims for trademark infringement." *Id.* at *2 (quoting *Charter Oak Fire Ins. Co. v. Hedeen & Cos.*, 280 F.3d 730, 736 (7th Cir. 2002)). Thus, the district court found that trade dress did not fall within the coverage for infringement of title because trade dress is different from "names and related trademarks." *Id.* (internal quotation marks omitted). While this Court has no quarrel with the application of Illinois law in *Priceless Clothing*, it is New York law that this Court is to follow, and Defendant cites no New York authority that defines "title" as limited so narrowly to only names and trademarks, regardless of whether title should encompass trade dress.

Defendant also argues that title should not be found to encompass trade dress because many of the courts that have determined that coverage existed for trade dress infringement have done so under a policy that included an enumerated offense not present in the Policy at issue here – misappropriation of advertising ideas or style of doing business. (Def.'s Mem. 14.) However, the fact that trade dress infringement may be covered by other policy provisions does not preclude it from also being covered by policies insuring infringement of title. Indeed, if Defendant wanted to exclude trade dress from coverage, it was incumbent on Defendant to do so explicitly. *See U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp. 2d 348, 358 (S.D.N.Y. 2006) ("An exclusionary provision must be drawn in such *clear and unmistakable* terms that no one could be misled." (emphasis in original)); *Am. Home Assurance Co. v. Port Auth. of N.Y. & N.J.*, 412 N.Y.S.2d 605, 609 (App. Div. 1979) ("Where a policy of insurance is written in such a manner as to be doubtful or uncertain in meaning, all ambiguities must be resolved against the company and in favor of the policy holder.").

marketing of the purportedly infringing products to customers, former customers, and potential customers of National, who were thereby confused as to the products' origin. (Pls.' Mem. 20-22.) In particular, Plaintiffs maintain that "construing the complaints liberally, the alleged injury sustained by National arose out of an 'offense' (the infringement of National's products [sic] style or trade dress) occurring in the course of advertising, marketing and selling the cloned products to the public." (*Id.* at 20-21.) Defendant, in contrast argues that National's complaints do not allege that the offense was committed in the course of advertising because the alleged infringement was the manufacturing and sale of the cloned lighting fixtures, as opposed to any advertising of Bridge Metal's products. (Def.'s Mem. 17; Def.'s Opp'n 12-15.)

"[T]here is much confusion in the caselaw concerning when an 'advertising injury' is 'caused' by advertising within the meaning of standard business insurance policies." *R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 247 (2d Cir. 2002) (internal quotation marks omitted). Courts applying New York law have differed on how explicit need be the connection between the injury complained of and advertising activity. Defendant is correct that the causal connection has been found lacking where the complaint alleges injury solely from the manufacturing and selling of infringing goods. *See A. Meyers*, 545 N.E.2d at 1208-09 (no duty to defend where the complaint only alleged harm from the importation and sale of plastic fasteners that infringed patents and sought to enjoin the manufacture and sale of these products "without reference to preventing any type of false, misleading or injurious advertising"); *see also Elite Brands, Inc. v. Penn. Gen. Ins.*, No. 02-CV-5623, 2004 WL 1945732, at *5 (S.D.N.Y. Sept. 2, 2004) (finding no connection between the activities complained of and the insured's advertising activities, where the complaint's allegations focused on the importation and sale of patent-infringing products and made no reference to advertising activities), *aff'd*, 164 F. App'x

19

60 (2d Cir. 2006); *Hosel & Anderson, Inc. v. ZV II, Inc.*, No. 00-CV-6957, 2001 WL 392229, at

*2 (S.D.N.Y. Mar. 21, 2001) ("The product itself is not an advertisement within the meaning of

the policy.").  Defendant also correctly notes that some courts have found allegations that the

insured advertised the infringing goods insufficient to trigger coverage absent allegations that the

advertisements themselves caused some injury.  *See, e.g., Jerry Madison Enters., Inc. v. Grasant

Mfg Co.*, No. 89-CV-2346, 1990 WL 13290, at *4 (S.D.N.Y. Feb. 15, 1990) (finding no duty to

defend because the copyright infringement claim was directed solely against the insured's sale

and manufacture of infringing jewelry, and not the marketing of the product); *see also Axelrod v.

Magna Carta Cos.*, 851 N.Y.S.2d 67 (Table), 17 Misc.3d 1127(A), 2007 WL 3378346, at *4

(Sup. Ct. Nov. 7, 2007) (concluding that there was no duty to defend, despite specific allegation

of copyright infringement, an enumerated offense, because "[i]t is not sufficient to allege that

infringement occurred merely in connection with the manufacture and sale of goods," or allege

"that the insured engaged in advertising activities with respect to the infringing goods . . . absent

additional allegations that the advertisements themselves infringed copyrights and thereby

caused some injury"), *aff'd in part, modified in part by* 880 N.Y.S.2d 69 (App. Div. 2009).

However, in other cases courts have found a duty to defend in the face of broad

allegations of marketing an infringing product.  For example, the Second Circuit has held that an

insurer had a duty to defend a trademark infringement action where the complaint alleged that

the insured had "marketed, distributed and sold goods . . . with the express intent of causing

confusion and . . . misleading the purchasing public," because marketing is a "broad and multi-

faceted" term that can be construed to include activities within the embrace of advertising, and

the possibility that liability could "rest on facts relating to activities in the course of [the

insured's] advertising [could not] be eliminated solely by examining" the underlying complaint.

*Century 21*, 442 F.3d at 81, 83; *see also CGS Indus.*, 751 F. Supp. 2d at 452 (concluding that

under a liberal construction of the complaint, the alleged injury arose out of an offense in the

course of advertising where the complaint alleged that the insured "manufactured and advertised

counterfeit products, causing confusion and mistake in the minds of the purchasing public"

(internal quotation marks omitted)); *Technaoro Inc. v. U.S. Fid. & Guar. Co.*, No. 05-CV-9216,

2006 WL 3230299, at *3-4 (S.D.N.Y. Nov. 7, 2006) (relying on *Century 21* and concluding that

activity could fall within the scope of advertising where complaint alleged that insured's

"manufacture, promotion or sale" of jewelry items with the infringing mark which allegedly

created a likelihood of confusion such that the purchasing public was likely to believe the

insured's products were made by or connected with the plaintiff); *Energex*, 1997 WL 358007, at

*3-4 (finding a nexus between the injury and advertising activity, even though the word

advertising was not used in the complaint, because the complaint "was clearly concerned with

preventing or ending any confusion between [the insured's] product and that of the [underlying

plaintiff]," and it was "clear that the confusion which was created through [the insured's]

communications with its customers took place through advertising"); *Mass. Bay*, 1996 WL

389266, at *8 (finding a connection between injuries alleged from trade dress infringement –

which was an advertising injury offense under the misappropriation of a style of doing business

definition – and the insured's advertising activities, where the complaint made numerous

references to the insured's marketing activities and efforts to promote the sale of jewelry pieces

that allegedly infringed trade dress and the complaint requested an injunction prohibiting the

insured's advertising); *GRE Ins.*, 691 N.Y.S.2d at 246-7 (concluding that the insured was alleged

to have committed copyright infringement in the course of advertising where the complaint

alleged that the insured was advertising and distributing the infringing products and requested

that the insured be enjoined from, inter alia, advertising or promoting the infringing products, even though the "primary thrust of the complaint" was that the insured was manufacturing and selling infringing products).

Defendant points out that the complaints in many of these cases mentioned actual brochures or advertising materials, which are not referenced in either of National's complaints. However, the Court concludes that such physical materials are not necessary to find the required causal connection in the instant case. *See Technaoro*, 2006 WL 3230299, at *4 (noting that allegation of "promotion" of infringing products was itself sufficient to come within advertising injury coverage). The common, everyday meaning of "'[a]dvertising' is action intended to make something known to the public or to call public attention to something by emphasizing its desirable qualities so as to arouse a desire to buy." *Ben Berger & Son, Inc. v. Am. Motorist Ins. Co.*, No. 94-CV-3250, 1995 WL 386560, at *3 n.3 (S.D.N.Y. June 29, 1995). As the Second Circuit has noted, "the relevant causation issue with regard to insurance coverage is not whether the injury *could have* taken place without the advertising, but whether the advertising did in fact *contribute materially* to the injury." *R.C. Bigelow*, 287 F.3d at 248 (emphasis in original) (internal quotation marks omitted).[12]

National's complaints, fairly read, allege that Plaintiffs specifically copied National's distinctive trade dress to make consumers think that Bridge Metal's light fixtures originated from, or were connected with, National's and marketed the fixtures to the public with that purpose in mind. In the NY Action, for example, National alleged that Plaintiffs: "created . . .

---

[12] The *R.C. Bigelow* case involved physical advertisements displaying pictures of the infringing trade dress, unlike in the instant case where the mention of advertising is not as explicit. However, the court's discussion of the causal nexus is still instructive here, where Plaintiffs' marketing of the infringing goods was alleged to have caused consumer confusion.

virtual clones of the National product line, which were being marketed to the public in [Bridge

Metal's] showroom" (Smith Cert. Ex. A, ¶ 39); were "telling the potential clientele . . . [that

Bridge Metal] could manufacture fixtures just like National's for a less expensive price" (*id.*

¶ 40); were "marketing to National's very same clientele these unlawfully manufactured lighting

fixtures" (*id.* ¶ 48); and were trying to "falsely advertise and deceptively palm off their products

so as to confuse and deceive the public about the true origin of the fixtures," (*id.* ¶ 52).  Indeed,

National specifically sought to enjoin Plaintiffs from, inter alia, "marketing" or "advertising"

lighting fixtures that are likely to cause confusion or deception or to dilute the distinctive quality

of National's fixtures, and from engaging in "conduct that tends to falsely represent, or is likely

to confuse, mislead, or deceive purchasers, [Bridge Metal's] customers, National's customers,

and other members of the public to believe that [Bridge Metal's] products are connected with

National."  (*Id.* pp. 27-28.)  *See Technaoro*, 2006 WL 3230299, at *4 (noting that complaint's

"prayer for relief" included request to destroy all materials used to display or promote allegedly

infringing goods, which further supported claim for advertising injury coverage).  Likewise, in

the NJ Action, National alleged that virtual clones of its products "were being marketed to the

public in [Bridge Metal's] showroom" (Smith Cert. Ex. C, ¶ 32), and again sought to enjoin

Plaintiffs from, inter alia, "marketing" or "advertising" "any lighting fixture not originating with

National, that is likely to cause confusion, deception, or mistake or that dilutes or is likely to

dilute the distinctive quality thereof," (*id.* ¶¶ 39-99).

Therefore, this is not a case where the harm was alleged to have been caused solely by

the manufacture or sale of the infringing goods; instead, National's complaints contain

allegations of injuries directly caused by the marketing and portrayal of these goods to the public

based on the infringing trade dress.  One court has concluded that a claim for trade dress

infringement necessarily "includes as an element of proof some communication between seller and consumer." *Energex*, 1997 WL 358007, at *4; *see also* 3 New Appleman Law of Liability Insurance § 18.02(3)(c)(i) (Matthew Bender, Rev. Ed. 2011) (noting that a majority of courts have found coverage for trade dress infringement under advertising injury provisions because "infringing . . . trade dress will necessarily occur in the course of the policyholder's advertising activities").

Again, the Court is mindful that "the relevant causal nexus should be easier to show in the context of the duty to defend as opposed to the duty to indemnify," because in assessing the broad duty to defend, "courts look to whether allegations state a *potentially* covered claim, rather than whether the claim is actually covered." 3 New Appleman Law of Liability Insurance § 18.02(3)(b)(ii) (emphasis in original). Thus, the Court's determination that Defendant had a duty to defend is not meant to suggest that if Plaintiffs had been found liable to National, Defendant would have been obligated to indemnify them for any damages incurred. Rather, the existence of these allegations cannot definitively foreclose the possibility of some covered liability and, therefore, Defendant had a duty to defend Plaintiffs against National's claims. *See Century 21*, 442 F.3d at 83-84 (noting that allegation that insured marketed infringing products suggested possibility of advertising injury, thus triggering duty to defend, but duty to indemnify could be excused if facts revealed that such allegation should be limited to exclude advertising – as distinguished from sales – of products).

### 3.  Potential Exclusions

Defendant also argues that it was not required to defend Plaintiffs in the National lawsuits because two exclusions in the Policy barred coverage. If an insurer asserts that coverage should be denied based on an exclusion clause, "the burden rests upon the insurance

company to demonstrate that the allegations of the complaint can be interpreted only to exclude coverage." *Atl. Mut.*, 763 N.Y.S.2d at 62; *see also Hugo Boss*, 252 F.3d at 615 ("'If the insurer is to be relieved of a duty to defend, it must demonstrate that the allegations of an underlying complaint place that pleading solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation.'" (quoting *Hanover Ins. Co. v. Cowan*, 568 N.Y.S.2d 115, 116 (App. Div. 1991) (alteration omitted))).  "[A]n insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Sea Ins. Co. v. Westchester Fire Ins. Co.*, 51 F.3d 22, 26 (2d Cir. 1995) (internal quotation marks omitted); *see also CGS Indus.*, 751 F. Supp. 2d at 450 ("'[E]xclusions are subject to strict construction and must be read narrowly.'" (quoting *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152 (N.Y. 2006)).

### a.  Breach of Contract Exclusion

Defendant first argues that coverage is barred by the exclusion for advertising injury arising out of a breach of contract.  Under New York law, an exclusion for advertising injury arising out of a breach of contract is governed by a "but for" test.  *See Hugo Boss*, 252 F.3d at 623 n.15 (citing *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 668 N.E.2d 404 (N.Y. 1996)).  "Thus, only if the advertising injury would not exist *but for* the breach of contract, would the injury 'arise out of' a breach of contract." *Id.* (emphasis in original).

Defendant argues that this exclusion should apply because the trade dress infringement claims arose out of Bridge Metal's breach of its confidentiality agreement with National.  (Def.'s Mem. 19.)  Defendant emphasizes that both the NY Action and the NJ Action contained a breach of contract cause of action, that the relationship between Bridge Metal and National was contractual, and that National's claims were based on its provision of confidential information to

25

Bridge Metal pursuant to the confidentiality agreement.  (*Id.* at 20.)  Thus, Defendant asserts that

the trade dress claim would not have existed "but for" Bridge Metal's breach of contract.  (*Id.* at

21.)  In support of this contention, Defendant cites *Ben Berger* as applying the breach of contract

exclusion in an arguably similar factual setting.  However, the *Ben Berger* court merely held that

the exclusion would bar coverage of the breach of contract cause of action, and, in fact,

concluded that the insurer did have a duty to defend the entire action because it had not met its

burden to show that *all* of the potentially-covered claims (which included a trade dress

infringement claim) were excluded by the policy.  *See Ben Berger*, 1995 WL 386560, at *4.[13]

    Plaintiffs, in contrast, argue that this exclusion should not apply because "National's

trade dress rights existed independent of its contract with Bridge Metal and would exist even if

National had never entered into the agreement and/or if the agreement had not been breached."

(Pls.' Opp'n 16 (alteration and internal quotation marks omitted).)  Plaintiffs' position finds

support from the Second Circuit, which has held that a breach of contract exclusion did not bar

coverage for a trademark claim because the plaintiff's "trademark rights arose long before it

entered" into the agreement in question with the insured, and would exist independent of the

contract.  *Hugo Boss*, 252 F.3d at 623 n.15; *see also Energex*, 1997 WL 358007, at *5 (exclusion

barred coverage of breach of contract claim, but insurer still had duty to defend all of the claims

because it had not met its burden of showing that all potentially-covered claims were excluded as

---

        [13] The recent decision in *Advance Watch Co. v. Travelers Property Casualty Co. of
America*, No. 10-CV-3305, 2011 WL 446271 (S.D.N.Y. Jan. 21, 2011), which Defendant
submitted with its letter to the Court dated May 26, 2011, is also inapposite.  In that case, the
court concluded that the breach of contract exclusion barred coverage entirely because the court
found that the underlying complaint contained *only* a breach of contract claim (although there
were several contract breaches asserted).  That is not the case here, where breach of contract was
one of seventeen causes of action in the NY Action and one of thirteen causes of action in the NJ
Action.

breach of contract claims); 3 New Appleman Law of Liability Insurance § 18.02(5)(e) ("Because IP rights arise independently from contracts, and can be infringed in the absence of contract, . . . courts [applying 'but for' causation] usually find that infringement claims fall outside the exclusion."). Therefore, even if the specific breach of contract causes of action might be excluded from coverage, Defendant has not shown that all of the claims in National's complaints are "solely and entirely within the exclusions of the [P]olicy," *Hugo Boss*, 252 F.3d at 615, and, accordingly, Defendant was required to defend Plaintiffs in the entire actions.

### b. Knowing Violation of Rights Exclusion

Defendant next argues that it was not required to defend Plaintiffs based on the Policy's exclusion for "'advertising injury' caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict 'advertising injury.'" (Def.'s Mem. 21.) Defendant argues that National's complaints assert that Plaintiffs knowingly, intentionally, and willfully breached the confidentiality agreement with the intent to infringe National's trade dress, purloin National's trade secrets and proprietary information, compete with National, and steal its customers and business. (*Id.* at 21-22.) Defendant asserts that National's allegations make clear that "knowing and intentional conduct pervade and underscore the entire claim." (*Id.* at 22.) Defendant cites two cases in support of its contention. The first, *Dairy Source, Inc. v. Biery Cheese Co.*, 674 N.W.2d 680 (Wis. Ct. App. 2003), is a Wisconsin case applying Wisconsin law. The second, *Atlantic Mutual*, involved a different exclusion (barring coverage for advertising injury arising out of oral or written publication of material with knowledge of its falsity) and was decided after the court in the underlying lawsuit had already determined that the insured's acts were in fact intentional. *See Atl. Mut.*, 763 N.Y.S.2d at 63-64.

Plaintiffs argue that this exclusion does not bar coverage because, although National's complaints alleged intentional conduct, none was proven and Plaintiffs could have been found liable for several of National's causes of action without any finding of intentional conduct, including the Lanham Act claims in the NY Action and the unfair competition and conversion claims in the NJ Action.  (Pls.' Opp'n 17.)  Plaintiffs' position with respect to the Lanham Act claims finds support in New York case law.  *See CGS Indus.*, 751 F. Supp. 2d at 452 (concluding that the same exclusion did not bar coverage of action asserting Lanham Act and other claims despite allegations of intentional misconduct, because it had not been determined whether the acts were committed with the knowledge that they would violate the rights of another and the insured could be found liable for violations of the Lanham Act without committing intentional misconduct); *Mass. Bay*, 1996 WL 389266, at *11 (exclusion for intentional or willful conduct did not excuse duty to defend even though complaint alleged that the insured willfully and intentionally violated § 43(a) of the Lanham Act by infringing trade dress because, "[a]lthough the presence of intent is relevant to the imposition of punitive damages under this act, wrongful intent is not essential to recovery under Section 43(a) of actual damages suffered"); *Cosser v. One Beacon Ins. Grp.*, 789 N.Y.S.2d 586, 587 (App. Div. 2005) (rejecting contention that coverage was excluded based on allegations that insured's wrongful conduct was knowing and intentional and concluding there was a duty to defend because the insured could be liable to the plaintiffs under the Lanham Act without a showing of intentional conduct and, thus, there was a reasonable possibility the insured could be held liable for an act covered by the policy); *GRE Ins.*, 691 N.Y.S.2d at 248 (insurer could not establish that copyright infringement claim fell solely and entirely within exclusion despite allegations that the insured committed the infringing acts willfully and deliberately, because intent is not a required element of copyright infringement

28

and, thus, it was possible for the insured to be found liable without being found to have acted willfully and knowingly).[14]  In addition, in the NJ Action, Plaintiffs could have been found liable under New Jersey law for unfair competition without any finding of intentional conduct.  *See Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 494 (D.N.J. 1998) (stating that under New Jersey common law, unfair competition encompasses both (1) passing off one's goods or services as those of another and (2) unprivileged imitation, and listing the elements of both, which for the latter, does not include intent).[15]

The Court agrees that despite the allegations of intentional conduct by Plaintiffs, National's complaints asserted covered causes of actions for which Plaintiffs could have been found liable without any intentional conduct.  The allegations in the complaint do not foreclose the possibility that Plaintiffs could have been liable to National without the court finding that

---

[14] According to an applicable practice guide, this is the predominant view:

> The majority of jurisdictions hold that even if the underlying complaint alleges that the policyholder knew that it was committing a wrongful act, the insurance company still has a duty to defend if the policyholder could still be liable without a showing of intentional conduct.  Because intent is not a required element of trademark or trade dress infringement, but rather is relevant to the issue of damages only, most courts have held that the exclusion does not relieve an insurer from its duty to defend such claims.
> A few courts, however, have held that an insurance company does not have a duty to defend if all of the factual allegations are premised on intentional, knowing conduct, even though recovery could be had under a lesser standard such as negligence.  These cases all violate the fundamental principle that the duty to defend is broader than the duty to indemnify, and when there are covered and uncovered claims alleged there is a duty to defend the entire complaint.

3 New Appleman Law of Liability Insurance § 18.02(5)(b) (footnotes omitted).

[15] Plaintiffs argue that they could have been found liable in the NJ Action for conversion without intentional conduct.  Although Plaintiffs are correct that conversion does not require intent under New Jersey law, that is irrelevant to the current exclusion because the conversion claim does not involve an advertising injury.

Plaintiffs knew that their conduct would violate National's rights and inflict the advertising injury at issue.  Thus, Defendant has failed to "demonstrate that the allegations of the complaint can be interpreted only to exclude coverage" and it had a duty to defend Plaintiffs in the underlying lawsuits.

### D.  Coverage for Property Damage

Plaintiffs also assert that Defendant was obligated to defend them in the NJ Action under the Policy's property damage provision.  The Court has already concluded that Defendant was required to defend Plaintiffs in both the NY Action and the NJ Action under the Policy's provision for advertising injury coverage but, for the sake of completeness, the Court also will address the applicability of the property damage provision.  The Policy provides coverage for property damage that is caused by an "occurrence."  (Roberto Decl. Ex. A, at T0130.)  The applicable property damage definition is "[l]oss of use of tangible property that is not physically injured."  (*Id.* at T0164.)  Occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.* at T0143.)  Thus, Defendant had a duty to provide a defense if National's complaint could be read to allege the loss of use of tangible property where the loss was caused by an accident.

In the NJ Action, National alleged that it provided Bridge Metal with, inter alia, assembly drawings, wiring instructions, mounting details, actual fixture samples, and specification sheets, all of which Bridge Metal was supposed to destroy or return to National once the merger negotiations failed.  (Smith Cert. Ex. C, ¶¶ 21, 24.)  In its conversion claim, National alleged that Plaintiffs willfully and wantonly "converted National's property by misappropriating it for their own use and failing to return it after termination of their relationship with National."  (*Id.* ¶¶ 49-50.)  The property in question is described as "trade secrets and other proprietary information

30

comprised of confidential drawings, formulas, designs, documentation, hands-on training, seminars, and other information." (*Id.* ¶ 14.)

Defendant first argues that this provision does not supply coverage in the instant action because National only alleged damages from intangible economic losses and not any loss of use of tangible property. (Def.'s Mem. 23.)  The Court disagrees and finds that some of the items allegedly retained by Bridge Metal can be considered tangible property, such as drawings, samples, and documentation.  However, the harm alleged by National is that Bridge Metal was using this property for its own benefit, not that National was unable to use the same property.  In their opposition to Defendant's motion to dismiss, Plaintiffs assert that National's complaint "sets forth allegations that National lost the use of, or the exclusive use of, the tangible property provided to [Bridge Metal]." (Pls.' Opp'n 22.)  The Court is unpersuaded.  While National's complaint could be read to allege the loss of the *exclusive* use of the drawings and other documents, "*exclusive* use" is not included in the Policy's definition of property damage.  Even under the broad duty to defend and the liberal construction given to insurance policy language in these situations, National's allegations do not fall within the Policy's definition.  National was clearly concerned with Plaintiffs' use of the information and property, not National's own inability to use it.  To that end, in their prayer for relief for their conversion claim, National asked the court to enjoin Plaintiffs from "[u]sing in any manner the information designated as Confidential Information as referenced herein." (Smith Cert. Ex. C, p.16.)  National did not request the return of the property.  Moreover, National alleged that when Plaintiffs converted the property to their own use, they did so in contravention of the confidentiality agreement, which required Plaintiffs to "either *destroy* . . . or return" the property. (*Id.* ¶ 24 (emphasis added).)  The fact that Plaintiffs could have avoided the conversion claim by destroying the property

31

indicates that National was not concerned with their own loss of use of the tangible property provided to Plaintiffs.  Accordingly, National's complaint in the NJ Action did not allege property damage within the Policy's definition and Defendant was not obligated to provide a defense under this provision.  However, because the Court already determined that the advertising injury provision did apply, Defendant was required to defend Plaintiffs on all of the claims in both National lawsuits.  *See Mass. Bay*, 1996 WL 389266, at \*4 ("The insurer's duty to defend the entire action is triggered even if only one claim is potentially covered by the insurance policy.").

## III.  Conclusion

For the reasons stated herein, Defendant was required to defend Plaintiffs in both the NY Action and the NJ Action under the Policy's provision for advertising coverage.  Defendant was not obligated to provide a defense in the NJ Action under the Policy's property damage provision.  Plaintiffs' motion for summary judgment is granted and Defendant is directed to reimburse Plaintiffs for the costs and expenses they incurred in defending the two lawsuits. Defendant's motion to dismiss, or alternatively, for summary judgment, is denied.  The Clerk of

Court is respectfully directed to terminate the pending motions (Dkt. Nos. 11 and 12), enter judgment for Plaintiffs, and close this case.[16]

SO ORDERED.

DATED:      White Plains, New York
            September 7, 2011

                                                KENNETH M. KARAS
                                                UNITED STATES DISTRICT JUDGE

_____

[16] Because the Parties have not mentioned any dispute as to the amount Plaintiffs incurred in defending the National lawsuits or, accordingly, the amount Defendant is required to pay as reimbursement, the Court assumes that no dispute exists. If there is such a dispute, the Parties shall inform the Court within thirty days of this Opinion and Order.

33

Service List (via ECF)
Sean Mack, Esq.
Dennis T. Smith, Esq.
Pashman Stein, P.C.
21 Main Street
Hackensack, NJ 07601
(201) 488-8200
Fax: (201) 488-5556
Email: smack@pashmanstein.com
*Counsel for Plaintiffs*

Joanna M. Roberto, Esq.
Goldberg Segalla, LLP
200 Old Country Road, Suite 210
Mineola, NY 11501
(516) 281-9800 ext. 9820
Fax: (516) 281-9801
Email: jroberto@goldbergsegalla.com
*Counsel for Defendant*